IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK APPLE IPHONE WITH VELCRO ON THE BACK, CURRENTLY LOCATED AT THE LEBANON, NEW HAMPSHIRE POLICE DEPARTMENT | Case No. 20-mj-108-01-AJ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Galen E. Doud, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been since May 2017. I am currently assigned to DEA's Manchester District Office. While attending the DEA Training Academy, I received training on a multitude of topics pertaining to drug investigations. My primary duties as a DEA Special Agent include investigating federal crimes and violations of the Controlled Substances Act at the local, national, and international level. I have been involved in numerous drug investigations, including multiple wiretap investigations, where I analyzed telephone toll records and subscriber information. I have also participated in both physical and electronic surveillances, including monitoring cell phone "pings," the purchase of illegal drugs, enforcement operations including the execution of both

search warrants and arrest warrants, and interviews of sources of information, confidential sources ("CSs"), drug traffickers, and drug trafficking organizations ("DTOs"). I am also a member of DEA's Special Response Team as well as DEA's Clandestine Laboratory Enforcement Team.

3. Prior to being employed as a DEA Special Agent, I was employed as a full time police officer with the City of Nashua, New Hampshire, Police Department for approximately four and one half years. I made several hundred arrests and initiated, conducted, and assisted in even more criminal investigations, many of which involved drug violations. I worked as a police officer in a uniformed and plain clothed capacity, and debriefed numerous defendants and cultivated many sources of information and confidential sources pertaining to drug trafficking organizations. I have also attended multiple trainings about drug related investigations, and relevant topics associated with drug investigations. I have a Bachelor of Science degree in Criminal Justice from Northeastern University.

4. Based on my training, education, and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, and fentanyl as well as other controlled substances. I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in the drug trade.

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. The property to be searched is a black Apple iPhone with Velcro on the back,[1] hereinafter the "Device." The Device is currently located at the Lebanon, New Hampshire Police Department, in Evidence Storage Locker #9.

---

[1] The Velcro on the back of the device obstructs any identifying markings on the back of the phone.

8.	The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.	Law enforcement has been investigating Chad Rombow's involvement in drug distribution since 2019.  More specifically, on July 17, 2019, investigators arrested Rombow at his residence in Grafton, New Hampshire, on a state warrant for one count of sale of a controlled drug.  That same day and early into the following day, law enforcement officers executed a state of New Hampshire search warrant at Rombow's residence.  During the search of Rombow's residence, investigators seized marijuana plants, digital scales, suspected drug ledgers, eight firearms, and numerous electronic devices, including a cell phone.

10.	Following his arrest, Rombow waived his *Miranda* rights and agreed to speak to investigators.  During the interview, Rombow admitted to both using and selling methamphetamine. He also explained that he communicates with his methamphetamine source of supply electronically, typically by a phone application called Signal, and other times by Facebook.  In addition, Rombow stated that the firearms seized were part of an effort to prevent anyone from robbing him of his drugs and personal property.

11.	Investigators obtained a state of New Hampshire search warrant for the cell phone seized on July 17, 2019, bearing phone number 603-304-9059.  A review of that phone revealed evidence of Rombow's involvement with drugs, including photographs and contacts of known drug distributors.  For example, one photograph shows suspected methamphetamine on top of a business card, "Chad Rombow…603-304-9059…Rombow's Repairs" on top of a digital scale that reads approximately 2.5 grams.  Another photograph depicts a silver cup type container

containing a quantity of suspected methamphetamine on a digital scale reading "12.96." Additionally, another photograph depicts a brown and black rifle within an opened rifle case.

12. On May 1, 2020, investigators debriefed a source of information (SOI 1) following a drug investigation after SOI 1 voluntarily waived its Miranda rights and agreed to speak with law enforcement.[2] SOI 1 approximated buying methamphetamine from Rombow roughly 100 times in up to ounce quantities, and said it last bought methamphetamine from Rombow several days earlier. SOI 1 said it communicates with Rombow by telephone. SOI 1 said Rombow uses the "secret" application Signal more when Rombow has not slept for several days, and will use his phone more after he has slept. SOI 1 added Rombow has recently been using lots of methamphetamine.

13. Investigators obtained a state of New Hampshire search warrant for SOI 1's cell phone. A review of SOI 1's phone included both text and Facebook communications with 603-304-9059. This is the same number Rombow utilized as described in the above July 2019 arrest and search warrant and is believed to continue to utilize. For example, on April 8, 2020, this number, believed to be utilized by Rombow texted SOI 1:

> I'm sorry my phone died and I guess my charger was junk to I just got it to turn on. So what do you have for paperwork I will let u have one at cost 650 and have 7 of the other things at 5 each

14. Based on my training and experience, I recognize "paperwork" to be a reference to money, and "one at cost 650" to be a reference to one ounce of methamphetamine for $650.

15. A review of Facebook messages between SOI 1 and Rombow via the Facebook

---

[2] SOI 1 has a criminal history that includes convictions for theft by unauthorized taking and receiving stolen property. SOI 1 was cooperating with law enforcement in hopes of potential consideration for a pending drug charge. SOI 1 made statements agents its own penal interest, and information provided by SOI 1 was able to be independently corroborated by law enforcement.

5

account name "Chad Rombow" also revealed drug conversation.  For example, on April 17, 2020, SOI 1 messaged Rombow stating, "I'm not in the mood Chad don't fucking start with me."  Also on April 17, 2020, SOI 1 messaged Rombow asking, "You seriously served Sheila…After u promised u wouldn't…Are u fucking kidding me," to which Rombow responded:

> I told her only if you couldn't help her and she had no other choice but to go elsewhere and then I could help her but not if it was going to step on ur toes she said she has been waiting and waiting. So I didn't cut ur throat in anyway if anything I saved you a customer because she was done waiting and I didn't cut any breaks she paid top dollar and I told I'm back up only. You can't expect people to wait on you if you u can only serve them if ur only gonna get from the one person who gives it to you really cheap or on the cuff you got to be able to have when they need it within reason. I could have straight up took her from you on the ground I'm a lot more consistent than you are but I told her straight up I can't and won't do that to you but I wouldn't make her go looking around and hoping she doesn't get ripped off or buying shit so ur welcome but im sure ur not gonna see it that way but  not to be rude but like you said last night I don't care but unlike some I do care and that's why I told her only as a back up and you can ask her

16. On May 27, 2020, the Hartford, Vermont, Police Department observed Rombow cleaning a 2014 red Toyota Tundra pickup truck bearing New Hampshire registration 4196053 in a parking lot in Hartford.  Rombow had an active state of Vermont arrest warrant for grand larceny.  Rombow was arrested, and both the DEA and the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) were notified.  A search incident to arrest yielded the Device and a Glock pistol in a holster on Rombow's hip.  In addition, two more firearms were seized from the truck, specifically a .22 caliber pistol under the driver's seat, and a shotgun in the front cab area.  An officer also observed a red shotgun shell in the truck.

17. Law enforcement subsequently made contact with Rombow's wife, Ashley Walters, the primary registered owner of the truck.  Walters gave investigators consent to search the truck.  A suspected rifle, ammunition, a glass pipe, butane lighter, and suspected drug ledger were located within the truck.  The Device was subsequently seized pending the ongoing drug investigation.  Hartford Police Detective Sergeant Scott Moody advised that Rombow called the Hartford Police Department on May 28, 2020 looking to retrieve his cell phone and firearms.

18.     On May 30, 2020, Canaan, New Hampshire Police conducted a debriefing of a source of information (SOI 2).[3]

19.     SOI 2 said it last bought two grams of methamphetamine for $200 from Rombow approximately one week earlier.  SOI 2 said the other night it received a call from Rombow, who stated he was "all set" and needed help moving some weight around, which SOI 2 clarified as meaning Rombow needed help selling methamphetamine.  SOI 2 said Rombow picks up about one quarter of a pound of methamphetamine roughly every five days from a person on Waukeena Lake Road in Danbury, New Hampshire, and SOI 2 said it has personally observed Rombow store drugs in his truck.  SOI 2 added that SOI 2 and Rombow communicate mostly by talking on the phone, but also via text message.  SOI 2 added that Rombow's customers, including SOI 2, will ask Rombow if he has "upstairs work" to ask if Rombow has methamphetamine, and customers will ask about work in "the basement" to see if Rombow has heroin for sale.

20.     Based on the totality of the above described facts and circumstances I believe that Rombow is using the Device to participate in and facilitate his continued drug dealing.

21.     The Device is currently in the lawful possession of the DEA.  It came into the DEA's possession after the Device was seized from Rombow incident to his May 27, 2020 arrest by the Hartford, Vermont Police Department, who then contacted the DEA.  Had the DEA not seized the Device, any evidence contained within the Device would likely have been lost.  I seek

---

[3] SOI 2 has a criminal history that includes convictions for controlled drugs acts prohibited, violation of probation or parole, receiving stolen property, resisting arrest/detention, simple assault, bail jumping, falsifying physical evidence, willful concealment, and criminal trespass. SOI 2 is cooperating with police in hope of potential consideration for a driving charge. SOI 2 made statements against its own penal interest, and information provided by SOI 2 has been independently corroborated by law enforcement.

this additional warrant to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

22. The Device is currently in storage at the Lebanon, New Hampshire Police Department, Evidence Locker #9. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

## TECHNICAL TERMS

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

8

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e. PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets,

and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training and experience, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

29. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Galen E. Doud
Galen E. Doud
Special Agent
DEA

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: __Jun 5, 2020__

Time: __4:18 PM, Jun 5, 2020__

_____
Andrea K. Johnstone
U.S. Magistrate Judge

## **ATTACHMENT A**

The property to be searched is a black Apple iPhone with Velcro on the back, hereinafter the "Device." The Device is currently located at the Lebanon, New Hampshire Police Department in Evidence Storage Locker #9.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of 21 U.S.C. 841(a)(1) and involve Chad Rombow since January 1, 2017, including:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. communications regarding drugs and drug transactions;

   d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e. any information recording Rombow's schedule or travel from January 1, 2017, to the present;

   f. any information regarding Rombow's use or possession of firearms;

   g. all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.